WILLIAM DAVIDS

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 24, 1901.*

1. PLEADING—*great strictness is required in pleas in abatement.* Pleas in abatement, being calculated to defeat justice, are required to be drawn with strict accuracy, even as to form.

2. SAME—*when a plea in abatement is open to demurrer.* A plea in abatement is demurrable which is signed by the defendant in person and not by counsel, and which is not properly entitled.

3. SAME—*right to plead in abatement is waived by appearance and continuance.* A defendant waives his right to plead in abatement by entering his appearance and having the cause continued on his own motion.

4. CONTINUANCE—*affidavit for a continuance for absent witness must show due diligence.* An affidavit for a continuance on account of an absent witness does not show due diligence in issuing a subpœna, where it appears the subpœna was issued only a few days before the commencement of the trial, whereas more than four months passed between indictment and trial.

5. SAME—*when affidavit shows that testimony of an absent witness is immaterial.* Since a conviction for assault with intent to murder may be had whether the bullet took effect or not, an affidavit for continuance which states that the absent witness would testify it was impossible for the bullet to have hit the prosecuting witness in the manner testified to, shows the testimony of such absent witness to be immaterial.

6. TRIAL—*great latitude should be allowed in cross-examining witnesses hostile to accused.* On a trial for assault with intent to murder, great latitude should be allowed the accused in cross-examining witnesses who were active partisans in the difficulties leading to the assault, and who are hostile to him.

7. SAME—*ill-will of prosecuting witness may be fully developed on cross-examination.* On a trial for assault with intent to murder it is competent to show, on cross-examination of the prosecuting witness, that he entertained feelings of ill-will and hostility toward the accused.

8. EVIDENCE—*what is part of the res gestœ in an assault with intent.* The actions of the people surrounding the accused at the time the alleged assault with intent to murder was committed, and the declarations made by them at that time, are a part of the *res gestœ.*

9. SAME—*what question should be allowed on cross-examining prosecuting witness.* On cross-examining the prosecuting witness in a

trial for assault with intent to murder, the defense should be allowed to ask the question whether the prosecuting witness heard anything said by the people surrounding the accused which indicated to him their feeling toward the accused, particularly where some of the people present had assisted in mobbing the accused the previous year at his home.

WRIT OF ERROR to the Circuit Court of Kankakee county; the Hon. JOHN SMALL, Judge, presiding.

This is an indictment for an assault with intent to commit murder against plaintiff in error, filed in the circuit court of Kankakee county on October 2, 1900. The cause was continued to the January term, 1901, upon the motion of plaintiff in error. The cause came on for trial at the January term, 1901. The jury returned a verdict, finding the defendant guilty of the crime of assault with intent to commit murder in the manner and form as charged in the indictment, and that the defendant's age was above twenty-one years, and fixing his punishment at imprisonment in the penitentiary. Motions for new trial and in arrest of judgment were overruled. Thereupon, the court rendered judgment in accordance with the verdict. This writ of error is sued out for the purpose of reviewing said judgment.

The material facts are substantially as follows: The plaintiff in error, William Davids, for some time prior to August 16, 1900, had been indebted upon an account for goods purchased to one Jules Gravelot, a hardware merchant living in Chebanse in Kankakee county. On August 14, 1900, plaintiff in error, who lived on a farm four or five miles south-west of the village of Chebanse, had business in Chebanse, and met Gravelot on the street. Gravelot asked him to pay the amount of this old account, but plaintiff in error stated to him that he had no money to pay it then, and that a portion of it he would not pay in any event. There were angry words between them about the account, and plaintiff in error left and

drove out to his farm. He came back, however, in the afternoon and was served with a summons by a constable by the name of Reilly to appear before a justice of the peace in a suit brought by Gravelot to recover the amount of the account. On August 15, 1900, plaintiff in error went to Watseka to consult his attorney, who advised him to pay the account. Plaintiff in error then came to Chebanse on August 16, 1900, and borrowed $10.00, and went to the office of the justice of the peace, and perhaps several other places, in order to find the constable, Reilly, but failed to find him. Passing Gravelot's store, he saw several men there, and went in and inquired where Reilly was. Gravelot remarked that he supposed he was looking for Reilly in reference to the suit brought against him, and said that plaintiff in error never paid his debts. Plaintiff in error denied this charge, and called Gravelot a liar. Gravelot came from behind the counter where he was standing, and went towards plaintiff in error. Some angry words passed between them, and one Albert Hoenck, who had ridden into town that morning with plaintiff in error in his buggy, intervened between the parties and seized the arm of plaintiff in error, saying, "We don't want to have a fight here." Plaintiff in error was angry, and Gravelot said, "I won't hit him unless he hits me." Plaintiff in error then said, "Come out in the street and I will smash you." Gravelot's store seemed to be on the corner and fronted south. There was a door leading from it on the south side of the store, and there were one or two doors on the east side of the store, leading out into the street which ran along the side of the store. Plaintiff in error left the store by the south door and went around into the side street nearly opposite one of the east doors, where his horse and buggy were hitched. Shortly after, Gravelot followed him out of the south door and turned and went northward upon the sidewalk opposite where plaintiff in error was standing. Gravelot stepped across a puddle of water near the sidewalk

into the street, and in the direction of a row of hitching posts in the street, where the horse and buggy of the plaintiff in error were hitched, and where plaintiff in error was at the time.

Plaintiff in error came into town that morning with a loaded pistol in his coat pocket. When he invited Gravelot to come out into the street and fight him, and the invitation was accepted, he took off his coat, and went towards the buggy, and threw the coat into the buggy. After plaintiff in error and Gravelot had left the store, several persons, who were in the store, went out upon the sidewalk and towards the scene of the expected fracas. One of these persons was W. A. Schafer, who lived in Chebanse; another was Henry Daley; another was Henry Wullfe; and still another was W. O. Brown. These parties came out of the east door or doors upon the side street, and several of them heard the dispute or quarrel between plaintiff in error and Gravelot in the store before they went out.

After Gravelot stepped across the mud-puddle and into the street towards the place where the plaintiff in error stood near his buggy, or about that time, plaintiff in error went to the buggy and took out his pistol. As Gravelot advanced towards him, he raised the pistol and attempted to fire, but the cap or cartridge snapped, and the pistol did not go off. He then raised the pistol and fired at or towards Gravelot, who was then distant about ten or fifteen feet. The evidence tends to show that the bullet grazed Gravelot's head and caused the blood to flow, but the injury to Gravelot was not serious, the bullet lodging in the store beyond. As soon as plaintiff in error had snapped or fired his pistol, Gravelot started towards him, and at the same time Schafer and Wullfe and Daley started towards him, and from the opposite side of the street one Christian Maas, who was not more than four feet in the rear of him when the pistol was fired, advanced towards him. Maas caught him around

the body. Gravelot seized him. Plaintiff in error was
thrown down. His head was beaten with the pistol by
Gravelot. One Eyerley kicked him while he was down.
Maas exclaimed, "Shoot the son of a bitch!" Two of
plaintiff in error's ribs were broken, and the skin of his
face was badly cut. When plaintiff in error went to Wat-
seka on August 15, the day before the difficulty, to see
his lawyer, he there obtained the revolver which was in
his possession at the time of the difficulty. Previous to
this time, plaintiff in error had had a falling out with
his wife, and there had been a divorce between them.
This revolver had been sold by Gravelot to one Haw-
kins, a hired man in the service of plaintiff in error, and
had been introduced in evidence and used in some way
as an exhibit in the divorce suit between plaintiff in er-
ror and his wife. Plaintiff in error states that, when he
went to Watseka to see his lawyer about the suit brought
against him by Gravelot, his lawyer told him to take
away the revolver and the cartridges with it, as he no
longer wished to keep possession of it. That night plain-
tiff in error stayed at the farm of a Mr. Benjamin, where
he took the revolver and the box in which it had been
placed. The revolver was there seen by the family, and
there is some evidence tending to show that one or more
of the men on the place used it on the morning of Au-
gust 16 to shoot at a mark. A Miss Buffington, who was
a niece of Benjamin, and was at his house at the time,
stated that Mr. Benjamin's little daughter, twelve years
old, had the revolver and was handling it, and she told
plaintiff in error to take it. Thereupon plaintiff in error
put the revolver in his pocket, and had it in his pocket
when he started to Chebanse in his buggy on the morn-
ing of August 16. Albert Hoenck, who rode into the vil-
lage in the buggy with him, says that, while they were
going in, plaintiff in error took some cartridges out of
his pocket and loaded the empty barrels of the revolver,
and then replaced the revolver in his coat pocket.

There is some evidence tending to show that, more than a year prior to the time when this difficulty occurred, to-wit, about May, 1899, after the trouble had begun between plaintiff in error and his wife, and after their separation, some men came to the farm of plaintiff in error and maltreated him.   The evidence tends to show that they were masked; that they blindfolded him; that he was knocked down and beaten; that tar was poured over him, and that these masked men threatened that, if he did not take his wife back, or give her his property, they would kill him.   Before they left, they took from him the cloth that had blindfolded him, but the evidence fails to show that he recognized all of these parties, or knew who all of them were.   After leaving him, they went towards Chebanse.

Among the instructions given by the court for the defendant at his request, were the following:

"14. You are instructed, that the law is, if a person is assaulted in such a way as to induce in him a reasonable belief that he is in actual danger of losing his life or of suffering great bodily harm, he will be justified in defending himself, although the danger be not real, but only apparent.   Such a person will not be responsible, criminally, if he acts in self-defense from real and honest convictions as to the character of the danger induced by reasonable evidence, although he may be mistaken as to the extent of the actual danger.

"15. You are instructed by the court that if you find from all the evidence in this case that Jules Gravelot and the defendant, on the day in question, went out upon the streets in Chebanse to engage in a fist fight, and if you further find from all the evidence in this case that at the time said parties went out upon the streets the defendant had no thought or intention of shooting the said Gravelot; and if you further find from all the evidence that just before the parties met upon the street the defendant saw a number of other persons advancing towards

him in a threatening manner, and believed that they were acting in concert with said Gravelot and under such circumstances as would lead a prudent man to entertain fear that his life was in danger, or that he was in danger of receiving great bodily harm; and if you further find that the defendant at the time the shot was fired did entertain such a fear, then in such a case you should find the defendant not guilty."

Among the instructions asked by plaintiff in error, and refused by the trial court, were the following:

"22. You are instructed by the court that if you find from all the evidence in this case that Jules Gravelot and the defendant, on the day in question, went out upon the street in Chebanse to engage in a fist fight; and if you further find from all the evidence in this case that, at the time said parties went out upon the street, the defendant had no thought or intention of shooting said Gravelot; and if you further find that defendant placed the revolver in his buggy and beyond his reach in order that he might engage in a fist fight unarmed; and if you further find that afterwards he saw a number of other persons advancing upon him in a threatening manner, and under such circumstances as led the defendant to entertain a reasonable fear and an honest belief that his life was in danger, or that he was in danger of receiving great bodily harm; and if you further find that at that instant he for the first time formed the intent to use said revolver, and that he instantly seized it and instantly used it, then in such case he would not be guilty of an assault with intent to murder, and in such case you should find the defendant not guilty.

"23. You are instructed by the court that, if you find from all the evidence in this case that Jules Gravelot and the defendant on the day in question, went out upon the streets in Chebanse to engage in a fist fight; and if you further find from all the evidence in the case that, at the time said parties went out upon the street, the defendant

had no thought or intention of shooting the said Grave-lot; and if you further find from all the evidence that, just before the parties met upon the street, the defendant saw a number of other persons advancing upon him in a threatening manner and under such circumstances as led the defendant to entertain a reasonable fear and an honest belief that his life was in danger or that he was in danger of receiving great bodily harm, then and in such case the defendant had a legal right to defend himself, and in such case he had the right to use such force and such weapons as may have seemed to him necessary in his self-defense."

C. H. PAYSON, T. F. DONOVAN, and T. W. SHIELDS, for plaintiff in error.

BERT L. COOPER, State's Attorney, (H. J. HAMLIN, Attorney General, W. J. BROCK, and D. H. PADDOCK, of counsel,) for the People.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—The first error assigned by the plaintiff in error is that the court below erred in sustaining the People's demurrer to plaintiff in error's plea in abatement.

Plaintiff in error was indicted under the name of William Davids. He filed the following plea in abatement:

"Now comes William David, Jr., who is indicted by the name of William Davids, in his own proper person, and having heard the said indictment read, says that William David, Jr., is his name, and that by that name he was always called and known; without this, that he, the said William David, Jr., now is or at any time heretofore has been called or known by the name of William Davids, as by the said indictment is supposed; and this he, the said William David, Jr., is ready to verify, wherefore he prays judgment of the said indictment, and that the same may be quashed."

This plea was sworn to by the plaintiff in error on January 22, 1901; and the People filed a general and special demurrer thereto which was sustained.

It is claimed by plaintiff in error that the two names, "William Davids" and "William David, Jr.," cannot be regarded as the same name under the doctrine of *idem sonans.* It is well settled that the word "Junior," or its abbreviation, "Jr.," is not part of a person's legal name. "The word 'Junior,' or 'Jr.,' is merely a matter of description and is no part of a person's legal name." (*Bonardo* v. *People*, 182 Ill. 411.)

In *Gonzalia* v. *Bartelsman*, 143 Ill. 634, this court held that "the doctrine of *idem sonans* cannot be made to apply to two such distinct names as Meyer and Meyers." It would seem to follow, therefore, that the doctrine of *idem sonans* cannot be applied to the names "David" and "Davids." It is true that, in *Stevens* v. *Stebbins*, 3 Scam. 25, where suit was brought by one "Stevens Stebbins," and the note introduced in evidence was payable to "Steven Stebbins," it was held that there was no material variance; but there, inasmuch as the name "Stebbins" began with "S," "Steven Stebbins" and "Stevens Stebbins" would come under the rule of *idem sonans*, because the two names, pronounced together, would have the same sound, whether the first name was Steven or Stevens.

Although it may be true, however, that the doctrine of *idem sonans* is here inapplicable, nevertheless we are of the opinion that the court below committed no error in sustaining the demurrer to the plea in abatement. "As to pleas in abatement, it is to be observed that great strictness is required in framing them as they are dilatory, not going to the merits of the action. They must be signed by counsel—they must specify truly the parties in the cause." (*Holloway* v. *Freeman*, 22 Ill. 197.) "When a dilatory plea is filed, * * * the law requires the strictest technicality, especially in the title of the cause, the court, and term, and time, and every-

thing which serves to identify it with the cause in which it is intended to be filed." (*Fowler* v. *Arnold*, 25 Ill. 284.) Again, pleas in abatement and of misnomer cannot be pleaded after a general imparlance or continuance. (*Holloway* v. *Freeman*, *supra; Archer* v. *Claflin*, 31 Ill. 306; *Union Nat. Bank* v. *First Nat. Bank*, 90 id. 56; *Roberts* v. *Thomson*, 28 id. 79). In *Feasler* v. *Schriever*, 68 Ill. 322, it was held that pleas in abatement, being calculated to defeat justice, are required to be drawn with strict accuracy, even as to form, and, if there be the least inaccuracy in them, they cannot be supported.

In the case at bar, the plea in abatement was signed by plaintiff in error in person, and not by counsel. The plea was not properly entitled, and did not truly specify the parties in the cause. It is entitled "The People of the State of Illinois *v.* William David, Jr." The proper entitlement of the cause is, "The People of the State of Illinois *v.* William Davids." Again, in this case the cause was continued from the October term, 1900, to the January term, 1901, upon the motion of plaintiff in error, supported by affidavit; and, at the January term, a motion for a further continuance was made by plaintiff in error, which was overruled. By entering his appearance and moving to continue the cause the plaintiff in error acknowledged the jurisdiction of the court, and thereafter it was too late to plead in abatement. The demurrer filed by the People specifies, as grounds of demurrer, the objections which have been thus indicated; and a defective plea in abatement may be demurred to. (*Nixon, Ellison & Co.* v. *Southwestern Ins. Co.* 47 Ill. 444; 1 Ency. of Pl. & Pr. p. 39). In some cases, a plaintiff is allowed to practically defeat a plea in abatement without any replication by showing on the trial facts, which render it nugatory. (1 Ency. of Pl. & Pr. p. 39).

In the case at bar, the plea in abatement admits in its opening words that plaintiff in error, who claims that his real name is William David, Jr., is indicted in this case

by the name of William Davids.  Plaintiff in error there-
by admits that William David, Jr., and William Davids
are one and the same person.  The proof also sustains
this averment, inasmuch as the witness W. A. Schafer
has sworn that the plaintiff in error, who was seated
at the time in the court room, is the same person who is
designated as defendant in the suit; and that he is known
both as William Davids and as William David, and is
called by both names.  (*Feasler* v. *Schriever, supra*).  The
evidence is clear that the person indicted and tried is the
same person who is named in the indictment.  (*Bonardo*
v. *People, supra*).

*Second*—The second error, assigned by the plaintiff in
error, is the overruling by the trial court of his motion
for a continuance of the cause, made at the January term,
1901.  There was no error in overruling this motion for
a continuance.  It was based upon an affidavit setting
forth that one Gregg, a surveyor and civil engineer, was
a material witness and was absent from the State.  The
affidavit stated that Gregg had made a survey, and taken
a series of levels and measurements, at the place where
the crime is alleged to have been committed, a few days
after the shooting took place, and that, from the survey
and measurements thus made by Gregg, he would swear
that the bullet could not have struck Gravelot in the
manner stated by the latter in his testimony.  The affi-
davit does not clearly show, that the survey and meas-
urements, which the absent witness had made, could not
be re-made by another surveyor or competent man.  It is
not claimed that Gregg was personally present, or knew
anything about the facts of the difficulty.  Again, the
affidavit does not show diligence in the issuance of a
subpœna for the witness.  The subpœna was only issued
a few days before the commencement of the trial, where-
as more than four months elapsed between the return of
the indictment and the time of the trial.  Nor does the
affidavit show in what the defense of plaintiff in error

consisted.  But the main objection to the affidavit is its failure to show the materiality of the evidence of the absent witness.  On the contrary, the affidavit shows that the evidence of the absent witness would not be material. This is an indictment for an assault with intent to commit murder.   The alleged object of the testimony of the absent witness was to show that the bullet, discharged from the pistol by plaintiff in error, could not have struck the head of Gravelot.   If a person fires a revolver at or towards another either with malice prepense, or with a total disregard of human life, he may be convicted of an assault with intent to kill and murder the person so attacked; and, in such case, it makes no difference whether such person was struck by the shot or not.  (*Conn* v. *People*, 116 Ill. 458).  If, therefore, plaintiff in error made the assault upon Gravelot with intent to commit murder, it was immaterial whether Gravelot was struck by the bullet discharged from the pistol or not.

*Third*—The third error assigned by the plaintiff in error is the refusal of the court to permit the prosecuting witness, Gravelot, to answer certain questions proposed to him upon his cross-examination by counsel for the plaintiff in error.   Some of these questions were as follows:

"Did you hear anything said, which would indicate to you, or did indicate to you, the feelings of those people surrounding Mr. David there, towards him?"

"You knew that, some short time before that, a mob of men had taken him from his home in the night time, and had maltreated him, did you not?"

"Do you know, do you have any personal knowledge as to what transpired at the time of this white-capping affair?"

"Do you know whether Mr. W. A. Schafer was a member of that gang?"

"Do you know whether Mr. David, from anything that was said before this trouble,  *  *  * had any suspicion

or belief as to whether Mr. Schafer, who testified here yesterday, was a member of that mob?"

Each of these questions was objected to by counsel for the State, and the objection was sustained, and exception was taken by counsel for plaintiff in error. We are inclined to think that the trial court erred in sustaining the objections to these questions.

It is apparent from this record, that there was a strong feeling of animosity in the village of Chebanse against the plaintiff in error. About a year prior to this difficulty with Gravelot, certain persons had come to the farm of plaintiff in error and committed an assault upon him, spoken of by the witnesses as the "white-capping affair," and which is referred to more at length in the statement preceding this opinion. The difficulty, which led to this previous assault upon the plaintiff in error, had relation to a separation which had taken place between himself and his wife. The account, which Gravelot held against plaintiff in error, was made up of charges against him on account of goods purchased from Gravelot by his wife. Disputes had taken place between Gravelot and plaintiff in error in regard to this account several times during the course of a period, extending over more than a year prior to the difficulty of August 16, 1900.

Plaintiff in error, as is shown by the evidence, believed that some of the men, who attacked him on August 16, 1900, at the time he drew the pistol on Gravelot, were among those who had mobbed him previously in May, 1899. He swears that he recognized W. A. Schafer as one of the men, who were members of that mob in May, 1899. He also swears that Gravelot was there, and that Eyerley was there, and he declines to say whether Maas was there or not.

It is quite manifest that, among the persons who appeared upon the scene at the time of the difficulty with Gravelot on August 16, 1900, there were either some who had in the year previous been engaged in mobbing plain-

tiff in error, or some who sympathized with the attack, which had been made upon him by that mob. In view of this fact, the first question of those above quoted was properly addressed to the prosecuting witness, Gravelot, and he should have been allowed to answer it.

The actions of the people, surrounding plaintiff in error at the time of his difficulty with Gravelot on August 16, 1900, and the declarations made by them at that time, were a part of the *res gestæ*. Whenever it becomes important to show, upon the trial of a cause, the occurrence of any fact or event, it is competent and proper also to show any accompanying act, declaration or exclamation which relates to, or is explanatory of, such fact or event. Such acts, declarations or exclamations are known to the law as *res gestæ*. (*Lander* v. *People*, 104 Ill. 248).

"Declarations, to be a part of the *res gestæ*, are not required to be precisely concurrent in point of time with the principal fact if they spring out of the principal transaction, if they tend to explain it, are voluntary and spontaneous, and are made at a time so near it, as to preclude the idea of deliberate design; then they are to be regarded as contemporaneous, and are admissible." (*People* v. *Vernon*, 35 Cal. 49, and authorities there cited).

In *Brennan* v. *People*, 15 Ill. 511, the prosecution was permitted to ask one of the witnesses if he saw "any indication of a difference of opinion or purpose among the persons composing the crowd who rushed to the barn;" and we said in regard to this question (p. 515): "The question propounded to the witness was proper. It called for facts, and not for the opinions of the witness. It appeared from the evidence, that Story was followed by a crowd, and killed. It was important to show with what intent the crowd pursued him. This was clearly a part of the *res gestæ*. It was competent to ascertain this intention by interrogating witnesses, who observed the operations of the crowd, whether they discovered any difference of purpose among those composing it."

Moreover, if an answer to the question had developed the fact, that the feelings of the people surrounding the plaintiff in error were hostile, such testimony would tend to show the apprehension of harm entertained by the plaintiff in error at the time of the difficulty.

Again, the witness Gravelot was the prosecuting witness, and a trial court should not prohibit a full cross-examination of a prosecuting witness. It is competent to show, on the cross-examination of such a witness, that he entertained feelings of ill-will and hostility towards the accused. (*Tracy* v. *People*, 97 Ill. 101). On the trial for an assault with intent to commit murder, the broadest latitude should be allowed to the defendant in the cross-examination of witnesses, who are active partisans in the difficulty leading to the assault, and who are hostile in their feelings against the defendant. (*Sutton* v. *People*, 119 Ill. 250).

In reference to the questions addressed to the witness about the "white-capping affair" and the maltreatment of the defendant in the night time in May, 1899, by a mob of men, it is to be observed that the witness, Gravelot, had referred to this "white-capping affair" in his direct examination by the People. Upon his direct examination, Gravelot said that, while he and plaintiff in error were in the store and before they went out upon the street, plaintiff in error said: "He would fix those fellows that white-capped him yet; that he had not dropped that matter." Gravelot testified that he "knew what he meant when he referred to white-caps." In view of the fact, that Gravelot had thus referred to this "white-capping" affair in his direct examination, it was surely proper and allowable for the defense to go into the matter fully, so that the jury might see whether, from the surroundings, the plaintiff in error had reasonable ground to fear that he might be killed, or that great bodily harm might be inflicted upon him, either by the prosecuting witness, or by any of the persons there present.

It is true, that Gravelot says, that plaintiff in error told him, in the store upon that day, that he did not suspect him of having been present with the mob the year before.  Plaintiff in error denies that he said any such thing; on the contrary, he swears that he believed that Gravelot was present on the occasion referred to in May, 1899.  One of the witnesses, introduced by the People, named Grenschaw, says that, in the summer before the shooting, plaintiff in error was talking to him about the mob that "white-capped" him, and mentioned the name of Gravelot, and said: "I will fix those fellows."  A number of persons, to-wit, Daley and Schafer and Wullfe and Albert Hoenck and Brown, were in the store of Gravelot and heard the altercation, which took place there on August 16, 1900, between Gravelot and plaintiff in error, and yet none of these persons there present, all of whom testify in the case, mention the fact that plaintiff in error made the remark which Gravelot attributes to him.

However this may be, Daley and Schafer and Wullfe were in the store when plaintiff in error was there, and before he and Gravelot went upon the street.  Plaintiff in error swears, that he recognized Schafer as being one of the mob, which had attacked him the year before.  As soon as Gravelot and plaintiff in error left the store and went out upon the street, Schafer and Daley and Wullfe were seen leaving the side door of the store and coming towards plaintiff in error.  Maas, who had not been in the store, but was on the opposite or east side of the street, was also seen to be approaching towards plaintiff in error.  All these persons were engaged in an assault on August 16, 1900, upon plaintiff in error; and that assault was made so near to the time, when Gravelot advanced against plaintiff in error, as to appear to have been made simultaneously with such advance.

The evidence tends to show that, when Gravelot and plaintiff in error first went out upon the street, they intended to have a fist fight, and that plaintiff in error

took off his coat, and threw it into the buggy with the pistol in it.   Some of the witnesses testify that plaintiff in error was not armed, when Gravelot first went upon the street from the sidewalk.   It was after Schafer and Daley and Wullfe, and the others, who were in the store, came out and advanced towards him, and after he saw Maas and perhaps one or two others advancing toward him from the opposite side of the street, that plaintiff in error went to the buggy and took out his revolver. Gravelot says, in his testimony, that "it was less than a quarter of a minute after David started for the revolver that Maas had his arms around him."   Plaintiff in error swears as follows:   "I think Maas had hold of me when the revolver went off."   Schafer says: "Mr. Gravelot was just going out of the front door when we (Daley and Schafer) went out of the east door; David was in the middle of the street; did not see the revolver in David's hand when I first went out on the street;   *   *   *   we all three (Schafer and Daley and Gravelot) had hold of him; it was not a minute before we had him on his back;   *   *   *   I don't think Gravelot had hold of him before we did; I think Gravelot rushed on David as soon as the shot was fired; we were there at about the same time." Schafer says that, when he came out of the side door, he saw Maas standing towards McMahon's office, which was on the east side of the street and in the rear of plaintiff in error.   He also says that he had hold of David at the same time when Maas had hold of him, and that, when they felled him to the ground, they all had hold of him. Daley also swears that "Gravelot advanced and we advanced rapidly; we all went directly towards Mr. David; we grabbed him and Gravelot took the revolver away from him."   Daley also says: "I saw the blood on David's head before David was upon the ground; we had been struggling with David before I saw the blood; Gravelot struck David with the revolver before he went to the ground; we were all trying to get him to the ground;

I think there were two others besides us there; they came from that vicinity." Gravelot says: "First I saw of Mr. Maas was when he had his arms around David from behind; * * * he grabbed David about the same time I took the revolver; * * * I struck him about as hard as I could; I also struck him with my fist a great many times; I struck him in the face; we were both down on the ground when I was hitting him with my fist; after I got through beating him over the head with the revolver, I lost the revolver, and I think that Maas let loose of him." Wullfe says that plaintiff in error had his coat off when he first saw him go to the buggy and saw him come back again; "It was a very few seconds between the time I saw him go behind the buggy and when I saw him with the revolver; * * * I went out with the intention of helping Jules"(that is, Gravelot). Brown says that Gravelot "went as far as he could, and grabbed the revolver; don't know whether Maas got there first or not, it was all done so quick; Gravelot, the next I saw, was hitting David over the head with the revolver, and Maas was holding him, and David was trying to get away; * * * Mr. Daley and Schafer were there." Maas says: "David walked to the hind part of his buggy and put his coat in; saw David have the revolver; he got it from the buggy; * * * I grabbed David when the shot was fired; * * * I called on Mr. Gravelot to take the revolver; * * * when I saw Mr. Gravelot had the revolver I said, 'Shoot the son of a bitch;' * * * I was with those people who were scuffling more or less during all the trouble; * * * Gravelot had hold of him at that time; Mr. Schafer and Daley must have been there because, when I grabbed Mr. David, the revolver must have been taken by those two men; saw Gravelot hit David; saw somebody kick him; it was Dick Eyerley; he kicked him while he was down; Gravelot was on top of him; I had hold of him when he was down; Eyerley kicked him on the right side; Eyerley kicked while the struggle was going on."

Charles W. Down testifies: "David was stretched out on the ground at that time face down; there were from twenty to forty people there; when he got up he was covered with mud and blood; * * * when I first saw it, there were three hold of him; then there were only two, and, when we got there, David was stretched on the ground, and Gravelot had David's head between his legs and was pounding him wherever he could; I saw him strike him several times; David was attempting to get up when Richard Eyerley came up from behind and gave him a kick; he kicked him somewhere in the ribs or stomach on David's right side; Mr. David said, when he got the kick, 'My God, boys, give me fair play.'" Albert Hoenck says: "David put his coat in the buggy while Gravelot was on the sidewalk; Mr. Gravelot started off the walk towards David, and David went over to the buggy and got his revolver and told Gravelot to stand back; David was standing straight up when the shot was fired; Gravelot rushed at David; the revolver was taken from David, and I saw Gravelot striking him on the head with it; then the crowd got so thick I couldn't see what was going on." Doctor Smith swore that two of the ribs of plaintiff in error on the right side were broken, and his face was skinned and bruised, and that one eye was black, and so swollen as to be shut. One Trask testified that he heard a conversation between Gravelot and David several months before the shooting, and after the divorce suit, in which David charged Gravelot with having his (David's) wife in the cellar, and that Gravelot said, "You say that again, and I will knock you down."

It thus appears that the questions, addressed to Gravelot upon the cross-examination, and which he was not allowed to answer, might have developed, if they had been answered, the connection of Gravelot, if any existed, with the previous mobbing of plaintiff in error, and would have thereby revealed more fully the relations between them. Plaintiff in error would have been entitled

to follow up the answers to the questions propounded with evidence, tending to show that Gravelot was a member of the "white-capping" mob, or had guilty knowledge of the same, or had participated in it. This evidence would have tended to show what the condition of plaintiff in error's mind was at the time of the assault, and whether he entertained a reasonable fear at that time that he was in danger of losing his life or of receiving great bodily harm.

*Fourth*—It is further claimed by plaintiff in error, that the trial court erred in giving certain instructions which were given on behalf of the People, and in refusing to give certain instructions asked by plaintiff in error.

We are inclined to think that the trial court should have given the instructions asked by the plaintiff in error, numbered 22 and 23, and set out in the statement preceding this opinion.

It is quite clear from what has already been said that the difficulty, which occurred on August 16, 1900, had two phases, or should be looked at in two aspects. First, it began as a personal difficulty between Gravelot and plaintiff in error, who went out upon the street to engage in a fist fight. Second, there is evidence tending to show that, when plaintiff in error saw these men, some of whom, he had reason to believe, had mobbed him the year before, advance upon him from all directions, he was justified in concluding that he was to be assaulted, not by Gravelot alone, but by these other men in pursuance of the old feud. When the mob had maltreated him in May, 1899, they had threatened to kill him, unless he took his wife back or gave her his property. He neither took her back, nor gave to her his property.

Counsel for defendant in error claim that there was no error in the refusal of instructions, numbered 22 and 23, asked by plaintiff in error, upon the alleged ground that the substance of the same was embodied in instructions 14 and 15 given for plaintiff in error. This view, in

our opinion, is not correct.   Instruction No. 15 assumes
a belief on the part of plaintiff in error that all the
persons advancing towards him in a threatening manner
were acting in concert with Gravelot.   Instructions 22
and 23 leave out the assumption that they were acting
in concert.   "Concert," as defined by Webster, means
"agreement in a design or plan; union formed by mutual
communication of opinions and views."   While there may
have been some concert of action between Gravelot and
the persons who were in the store with him before the
shot was fired, there could have been no concert or agree-
ment between him and Maas and Eyerley and the others
who advanced from the east and south.   If parties were
advancing against plaintiff in error in a threatening man-
ner, and under such circumstances as led him to enter-
tain a reasonable fear and an honest belief that his life
was in danger or that he was in danger of receiving great
bodily harm, it would make no difference whether they
were acting in concert with Gravelot upon that particu-
lar occasion, or whether they were acting in pursuance
of a purpose to carry out the previous threat made by
them against plaintiff in error, that they would kill him
if he did not take back his wife or give her his property.

In addition to this, plaintiff in error had possession
of a revolver when he came into Chebanse on the morn-
ing of August 16, 1900.   The testimony introduced by
him tended to show, that his possession of the revolver
at that time was merely accidental, and resulted from a
visit to his attorney in reference to the suit that had been
brought against him upon the account.   On the contrary,
it seems to have been the theory of the State that the
possession of the revolver, under the circumstances al-
ready detailed, indicated previous preparation for an as-
sault on the part of plaintiff in error, and an intention
on his part to make the attack upon Gravelot.   Hence,
instruction No. 22 conditioned the right of the jury to
find plaintiff in error not guilty upon their finding that

the plaintiff in error placed the revolver in his buggy beyond his reach, in order that he might engage in the fist fight, and that he for the first time formed the intent to use the revolver when he saw other persons than Gravelot advancing upon him. It was for the jury to determine whether his possession of the revolver was the indication of a guilty intent, or whether his possession of it was accidental, and his use of it caused by the threatening attitude of these third parties towards him. This feature of instruction No. 22 is not embodied in any of the other instructions which were given.

On account of the restriction imposed by the trial court upon the cross-examination of the prosecuting witness, as above indicated, and on account of the refusal of that court to give instructions numbered 22 and 23, as set forth in the statement preceding this opinion, the judgment of the circuit court of Kankakee county is reversed, and the cause is remanded to that court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*