**People of the State of Illinois, Plaintiff-Appellee, v. Harold Johnson, Defendant-Appellant.**

Gen. No. 50,950.

First District, Fourth Division.

March 20, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Shelvin Singer and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Daniel W. Weil, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Defendant was found guilty by a jury of the murder of Albert Romano. He was sentenced to a term of not less than forty nor more than ninety years in the Illinois State Penitentiary.

CONTENTIONS ON APPEAL

1. Defendant was not proven guilty beyond a reasonable doubt.

2. Prejudicial evidence of other wrongdoing prevented a fair trial.

3. Evidence that the victim, Albert Romano, lived with and supported his invalid mother was prejudicial.

4. Hearsay testimony was wrongfully admitted.

5. The prosecutor's closing argument was prejudicial.

THE EVIDENCE

**The Prosecution**

Early on the morning of March 5, 1964, the body of Albert Romano was found in the rear of 4137 West Grenshaw. He had been killed by a bullet which entered the

187

left side of his chest and was fired from close range. He had abrasions on his neck and both wrists. There was medical testimony that the bullet wound was a "contact wound"; that such a wound almost never bleeds and that the bullet was recovered in the body.

*Testimony of Victoria McCormick*

In September of 1962 she went into the business of selling narcotics with defendant. Early in 1963 defendant bought a laundromat at 63rd and South Park. In June of 1963 he bought a record shop at 206 South Pulaski called "Harold's Record Mart." She and defendant were still in the business of selling narcotics but the business had become bad because of the poor quality of the merchandise and defendant was having difficulty meeting some of his financial obligations. Early in 1964 defendant began talking to the decedent about the possibility of his purchasing narcotics from the decedent. Decedent said he had very good quality narcotics and defendant took a sample to the witness' apartment to be tested. He found that the narcotics were not as good as decedent had said but were satisfactory and the decedent began to be his supplier. The witness worked in the record shop and decedent began coming there to demand money for his goods. He began calling and coming around quite often but defendant refused to pay, saying that the merchandise was inferior and could not be sold. Defendant was generally not in when decedent arrived and she gave messages to him and also relayed his responses. One week before his death, decedent came into the record shop and was quite angry. He told her to tell Johnson he was not going to let Johnson "mess him around"; that his people are "more or less pressing him" and that Johnson is "standing him up." When she related this conversation, defendant told her:

What does he mean like he is giving me some sort of ultimatum or something. I don't like the way that so and so talks anyway.

The following day defendant and decedent met in the record shop and after an argument they made arrangements for defendant or the witness to meet decedent and give him some money. The debt was no greater than $600.

On March 4 the witness arrived at her apartment at 226 North Karlov at 6:30 p. m. and found decedent being held on the couch at gunpoint by defendant. Decedent pleaded with her to talk defendant out of killing him. Defendant had the witness tie decedent's hands. She further testified that decedent said:

"Man give me a break, don't kill me. I have got a mother and my mother is an invalid and I have got to take care of my invalid mother." Harold told him to shut up. Harold told Alberto, "Man, you were just pressing me too hard, and I couldn't stand all the pressure, but you think I'm a damn fool anyway because I'm a nigger, did you ever think a nigger would kill a dago gangster?"

. . . . . .

"Alberto said, 'Man, I don't see how you could even think you are going to say about me thinking you are a damn fool, you know my wife is colored, man you shouldn't bring this kind of stuff in.'"

Defendant told the witness to stuff a handkerchief in decedent's mouth. Defendant then picked up a throw pillow, put it on top of the gun, moved to within eight inches of decedent and shot him. To make sure he was dead, since he was not bleeding, defendant strangled him with some nylon stockings. He then emptied decedent's pockets, keeping the money but burning decedent's other

possessions. She and defendant left and arrived at the record shop at about 7:30 p. m. where defendant called his nephew, Ronald Maxey, to ask him to get rid of the body. Ronald Maxey and defendant left the record shop together and arrived back at 9:30 or 10:00 p. m. driving the black Oldsmobile which she had parked in front of her house and which belonged to Ronald Maxey.

Miss McCormick testified further that she was not a partner in defendant's record shop or laundromat but that she would go to defendant for money whenever she needed it, that although defendant had a wife and family she had been living with him, that she had been a prostitute at times and supported men with earnings from prostitution and that she helped defendant get his start in business in this manner. She stated that a boiler exploded in defendant's laundromat but she didn't know on what date. According to the witness both Paul McCoy and Francine Morris worked in the record shop and had seen decedent there. McCoy had repaired guns for defendant on occasion. Decedent used narcotics but defendant did not.

At the end of May 1964 she left defendant and went to live with William Smith. Defendant asked her to return but she said that she would after she had "time to sort of get myself together." On June 17, 1964, defendant came to her apartment with a friend and she left with them. Defendant then threatened to strangle her for doublecrossing him and shook her and applied pressure to her neck but told her he would give her one more chance and to get in the car with them. Defendant told his friend that she could send him to the electric chair and asked him if he needed to kill her to avoid it. His friend said no and defendant let her out of the car. He had threatened her on other occasions. On June 18, because of her fear of being killed, she called David Connolly of the Federal Narcotics Bureau, told him of the killing and arranged to meet him.

She was living in police custody, was being guarded at all times, and the police provided her with lodgings, medical services and food. She knew she was guilty of murder but had not yet been indicted; that there was pending a narcotics charge against her in Federal Court on which the arresting officer was Connolly and she didn't know whether the State's Attorney would help her with the federal charge. She had used five or six aliases to avoid detection by the police; had both sold and used narcotics; had been a prostitute and she was twenty-nine years old and had a six-week old baby.

*Testimony of David Connolly, an employee of the United States Treasury Department, Bureau of Narcotics.*

He arrested Victoria McCormick on March 5, 1964, for a federal narcotics violation. However, no indictment had been returned and prosecution was still pending. He had also arrested Miss McCormick on March 14, 1961. Victoria McCormick called him on June 18, 1964, and the next day he took her into protective custody. He turned her over to the State's Attorney on July 22, 1964. On July 24 he spoke to defendant in his cell in the police station.

> I told Harold Johnson that I understood he was being charged with the murder of Albert Romano. He said, "yes they really got me backed up tight this time." I told him I understand the girl is going to be a state witness. He said, "that is what I understand. I didn't think she would turn me in, but in any case it doesn't make much difference, it is her word against mine."

*Testimony of Raymond Romano*

He was decedent's twin brother. Decedent lived with their mother who was a semi-invalid and decedent was in the exterminating business.

191

THE DEFENSE

*Testimony of Ronald Maxey*

He was defendant's nephew and was currently under indictment for charges growing out of the present case. In 1964 both he and his brother James were employed at defendant's laundromat. On Wednesdays defendant would come to the laundromat to collect the coins. He remembered that on Wednesday, March 4, one of the boilers at the laundromat blew up and that defendant on that particular Wednesday had arrived at the laundromat at between 6:45 and 7:15 p. m. but had remained until 10:00 or 10:15 p. m. waiting for the boiler to be repaired. His brother James and one Luther Fuller, a salesman, were there and the boiler was repaired by Paul McCoy. He did not help defendant remove a body from Vicky McCormick's apartment nor had he ever been there. His black Oldsmobile was parked on the street until March 20 of that year and was not used before this because he had neither acquired license plates nor a city sticker before then. He did not get the license plates immediately because the place where he had bought the car burned down and he had difficulty getting the title.

*Testimony of James Maxey*

He worked at the laundromat, was there on the evening in question and defendant arrived at about 6:30 and was still there when the witness left at 9:00.

*Testimony of William Lenz*

He was a police officer and had investigated this murder. He talked to a person named Carol or Karen Bridges of 4141 Roosevelt, Apartment 403, shortly after March 5, 1964, and she claimed to have seen Romano at 7:30 on the evening of March 4 in the Park Row Lounge. He had not tried to contact her since April 1964. On July 24,

1964, he searched Miss McCormick's apartment and the 1958 Oldsmobile and took objects and samples of materials to the crime laboratory but none of the various tests showed any blood.

## OPINION

█ 1. Defendant first contends that his guilt was not proved beyond a reasonable doubt. He argues that the testimony of Miss McCormick was not sufficient to convict because she is a dope addict and an accomplice, her testimony is uncorroborated and contains certain discrepancies. Although these factors do affect credibility they do not as a matter of law render the testimony incredible. The adequacy of the proof depends on the individual facts of each case. In People v. Palmer, 26 Ill2d 464, 187 NE2d 236, defendant was convicted of burglary by the testimony of an accomplice who was also a dope addict. In that case defendant's girl friend testified that he was with her in Missouri at the time of the burglary. His landlord testified that defendant hadn't been at home during the relevant time period and defendant's friend explained that he and not the defendant had placed one of the stolen machines in defendant's apartment and that he had gotten the machine from the prosecution's witness. In upholding the conviction the Supreme Court said at page 469:

> While the evidence linking defendant to the scene of the crime is the testimony of his accomplice, Yancey, a convicted felon and a narcotics addict, nevertheless such evidence is competent, even without corroboration, and we have repeatedly held that a conviction can be sustained by the uncorroborated testimony of an accomplice if the trier of fact is convinced of guilt beyond a reasonable doubt. People v. Flaherty, 396 Ill 304, 314; People v. Leslie, 18 Ill2d 420, 424.

■ Defendant suggests, however, that discrepancies in Miss McCormick's testimony impeach her. It is urged that at the trial Miss McCormick testified that when defendant and his friend came to threaten her they came into her apartment and made her leave a note for the man with whom she was living while before the Grand Jury she did not mention a note and said that she met the men outside her apartment. Miss McCormick also testified:

> I had threats from Harold Johnson on more than one occasion. On the first occasion I did see them outside the apartment, when I met Sonny. That was the first time I ever saw him, Pulaski and West End. Evidently I had gotten the first time and the second time and connected them together.
>
> . . . . . .
>
> The earlier threat was where I saw Sonny and Harold on a street. We got in the car and drove way out and we were talking and he was telling me he was going to have to kill me if I didn't go along with what he wanted me to do. This was the threat that I did not tell to the Grand Jury.

It was for the jury to decide whether there actually was a discrepancy in the testimony and if so to determine the weight to be given to it. See People v. Clay, 27 Ill2d 27, 187 NE2d 719.

■ ■ 2. Defendant's next contention is that evidence of other wrongdoing prejudiced his case and deprived him of a fair trial. Evidence of other crimes is admissible where the evidence is independently relevant to identity, absence of mistake or accident, motive or intent, or the existence of a common scheme or design. People v. Prohaska, 8 Ill2d 579, 134 NE2d 799. Defendant argues that evidence of his narcotics transactions with the decedent should not have been admitted since the existence of

the debt itself was sufficient to show motive. He argues that how the debt arose has no bearing. We disagree. The motive for this killing was not as simple as a mere obligation to pay $600. Decedent was being pressured for money by his supplier of narcotics who warned that "his people" were pressing him. Under these circumstances we do not believe that this debt for narcotics can be considered as an ordinary debt. Defendant seeks support for his argument in People v. Fuerback, 66 Ill App2d 452, 214 NE2d 330. In that case defendant sought to defend against a charge of robbery by an alibi. The prosecution introduced evidence that defendant was committing a second robbery (not the one for which he was being tried) during the time he claimed to be at his mother's house. The court held that it was prejudicial to permit evidence of what defendant was doing when the witness saw him. The fact that he was seen in a grocery store would have sufficed to contradict the alibi and therefore the commission of the robbery was not independently relevant. In the instant case the manner in which the debt arose was relevant to the pressures brought to bear on defendant and the likelihood of his responding with murder. In Woodward v. State, 197 Ga 60, 28 SE2d 480 the accused was charged with murder. In determining the admissibility of evidence regarding a transaction in Pennsylvania, the court stated at pages 484 and 485:

> There was evidence in the record to the effect that the accused and the deceased were jointly engaged in what is commonly known as fake race horse bets, and that a man in Pennsylvania had been swindled out of the sum of $30,000, and that there was a dispute and hard feelings between the accused and the deceased over the claim of deceased to a part of this fund. Evidence tending to establish a motive for a homicide is admissible, even though it relates to a

separate and distinct illegal transaction. (Citing cases.)

There was no error in the admission of the narcotic transactions.

■ ■ Defendant argues that it was prejudicial to admit evidence that he was under the surveillance of a narcotics agent, that a relative of his used narcotics, that defendant himself did not use narcotics, that he was having illicit relations with Victoria McCormick, and that he had accepted money from a prostitute. As to surveillance, the testimony was stricken and the jury instructed to disregard it. The other evidence was elicited without any specific objection to the questions or to the answers. People v. Burage, 23 Ill2d 280, 178 NE2d 389.

■ 3. Defendant's next contention is that he was prejudiced by the admission of evidence that decedent lived with and supported his invalid mother. Miss McCormick testified that the decedent mentioned this while pleading with defendant to spare his life. As such it was a part of the res gestae and properly admitted. Davids v. People, 192 Ill 176, 61 NE 537.

■ ■ 4. Defendant also contends that prejudicial hearsay testimony was admitted. He argues that Officer Lenz should not have been allowed to testify as to the nature of Paul McCoy's job (which included repairing a weapon), how long McCoy had worked for defendant and whether or not McCoy was an addict because he would in fact merely be reiterating the out of court statements of another. There is no showing of where Lenz got his information or that it was the mere reiteration of another's out of court statement. Defendant made no inquiry of Lenz to ascertain where he obtained his knowledge. We cannot say that this was hearsay. Defendant also contends that Officer Lenz's testifying that he got an affidavit from McCoy saying that there were thirty-two caliber bullets in a wall of the record shop was hearsay.

Officer Lenz was trying to establish the probable cause for his search of the record shop. He was not offering the statement to establish its truth. It was not intended to show that there were bullets in the wall of the shop. This was not hearsay. People v. Carpenter, 28 Ill2d 116, 190 NE2d 738. Moreover, Lenz was called as a witness by defendant and was responding to direct examination about the contents of the search warrant. Furthermore, defendant made no objection to the procecutor's question as to whether McCoy was an addict.

■■■■■■ 5. Defendant's final contention is that the prosecutor's final argument to the jury was prejudicial. Most of what he objects to, however, was a reiteration of testimony legitimately in evidence and the prosecutor's reference to it in the final argument was not prejudicial. Defendant also objects to the prosecutor's argument that:

> Harold Johnson lived off the earnings of Victoria McCormick. If the fact that she engaged in prostitution makes her a less desirable person what does it make Harold Johnson living off of her?

While this may have been improper we do not feel that it was seriously prejudicial. People v. Davis, 10 Ill2d 430, 140 NE2d 675. Defendant also objects to the prosecutor's explanation that he did not call certain witnesses because they might take the Fifth Amendment and defendant might move for a mistrial as being outside the scope of the evidence. Again, we feel this did not harm defendant. Finally defendant argues that the prosecutor's comment on the absence of Luther Fuller from the trial was grounds for reversal under People v. Rubin, 366 Ill 195, 7 NE2d 890. In Rubin the prosecutor said that the witness was not called because he would have said defendant was guilty. Here the prosecutor said:

> I ask you where is Luther Fuller? I asked him for a card, a name, and an address, anything for me

to find the Luther Fuller and I got nothing, no, no, no, no, no.

The strongest inference possible from this was that Fuller would not have supported the alibi of defendant, that he was at the laundromat on the night of the murder. Furthermore, this was a legitimate response to defendant's closing argument that if Luther Fuller wouldn't have supported his alibi the prosecution would have produced him. People v. Smith, 24 Ill2d 198, 200, 181 NE2d 77.

In closing argument defendant's counsel acrimoniously characterized Victoria McCormick as "vermin," "roach" and "hot pad" [sic]. Yet the jury believed her. We find no reason to override their determination.

Affirmed.

McCORMICK, P. J. and ENGLISH, J., concur.